## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**CHAMBER OF ARGENTINE-PARAGUAYAN** )
**PRODUCERS OF QUEBRACHO EXTRACT,** )
  *et al.*,                            )
                                        )
              **Plaintiffs,**        )
                                        )    **Civil Action No. 05-0811 (ESH)**
       **v.**                          )
                                        )
**CORNEL A. HOLDER,** *et al.*,              )
                                        )
             **Defendants.**        )
_____)

### MEMORANDUM OPINION

Plaintiffs Chamber of Argentine-Paraguayan Producers of Quebracho Extract and its two
Argentinean members, Unitan and Indunor ("the Chamber"), bring this action challenging
defendants' decision to resume sales of its remaining stockpiled quebracho, alleging that such
sales violate the Strategic Critical Materials Stock Piling Act ("Stock Piling Act"), 50 U.S.C.
§§ 98 *et seq.*  Plaintiffs have moved for summary judgment pursuant to the Administrative
Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), claiming that defendants have failed to provide a
rational basis for their conclusion regarding the market impacts from their proposed quebracho
sales in violation of this Court's order in *Chamber of Argentine-Paraguayan Producers of
Quebracho Extract v. Holder*, 332 F. Supp. 2d 43, 54 (D.D.C. 2004) ("*Chamber I*") and the
Stock Piling Act.  In response, defendants have filed a cross motion to dismiss or, in the
alternative, for summary judgment, asserting that their 2005 market analysis provides a rational
basis for their determination that resuming sales will not unduly disrupt the quebracho market.
Upon consideration of the pleadings and the administrative record herein, the Court concludes

that defendants' proposed sales do not violate the Stock Piling Act or the APA, for defendants'

analysis was not arbitrary, capricious, an abuse of discretion, or otherwise unlawful, and thus,

defendants' motion for summary judgment will be granted.

## BACKGROUND[1]

Quebracho is a vegetable tannin extract from the South American quebracho tree used for

tanning leather.  The two members of the Chamber operate three quebracho factories in

Argentina and are the only quebracho producers participating in international markets.  Under the

Stock Piling Act, the United States Department of Defense's National Stockpile Center

("DNSC") is authorized to relinquish (by sale or otherwise) its supply of quebracho, which was

acquired from South America during the Korean War.

In *Chamber I*, plaintiffs in the instant case claimed that the government's sales of

stockpiled quebracho in 2004, and the proposed sales for 2005, violated the Stock Piling Act,

which requires the government, when disposing of stockpiled materials, to make efforts "[t]o the

maximum extent feasible . . . to avoid undue disruption of the usual markets of producers,

processors, and consumers of such materials and to protect the United States against avoidable

loss."  50 U.S.C. § 98(e)(b)(2).  Because the government failed to provide sufficient evidence of

any analysis of the market impacts of its quebracho sales, this Court held that it was unable to

conclude that the government's decision was not arbitrary and capricious, and thus, it enjoined

DNSC from delivering quebracho or awarding new contracts to any entity purchasing quebracho

for consumption outside the United States until the agency had evaluated all the relevant factors.

---

[1]In *Chamber I*, this Court described the relationship between the Chamber and DNSC, the quebracho market, and the impact of DNSC's sales of stockpiled quebracho on that market over the past twelve years.  This background need not be repeated here.

In the wake of the Court's order in *Chamber I*, DNSC suspended all quebracho sales, began to develop a market analysis of the impact of potential future sales, and sought to determine a reasonable annual limit on international sales.  DNSC requested information from the Departments of State and Commerce and from a variety of participants in the domestic and international quebracho markets, including plaintiffs.  In July 2004, the Chamber submitted a report prepared by Everest Consulting Associates ("ECA") which concluded that the proposed DNSC sales would result in significant disruption of the quebracho market.  (*See* Administrative Record ("AR") at 122.)  This report supplemented a 2002 report prepared by ECA which had been submitted prior to *Chamber I*.

 In a September 2, 2004 letter, DNSC asked the Chamber to provide a variety of quantity, cost, and pricing information for use in its market analysis.  (*Id*. at 1-2.)  The Chamber responded the following month by providing information about quebracho production, sales, production costs, plant costs, breakeven capacity of the plant located in Formosa, and the Chamber's efforts to use or sell the quebracho it purchased from DNSC in 2002 and 2003.[2]  (*Id.* at 162-66.)  However, it did not provide certain company-specific data sought by DNSC.  (*Id.* at 62-63.)  The Chamber also requested information from DNSC on the procedures it would use in its analysis, expressed its desire to provide the agency with significant input, and offered to have Chamber officials travel to Washington, D.C. for a meeting.  (*Id.* at 165-66.)

On November 17, 2004, the Market Impact Committee ("MIC"), which advises DNSC on the market effects of the disposal of stockpile materials, published a notice in the *Federal*

---

[2]As described in *Chamber I*, in February 2002, Chamber member Unitan contracted with DNSC to purchase the 20,000 LT of quebracho that was available in 2002 and 2003 because it was concerned about the effect of such a release on international markets.  322 F. Supp. 2d at 46.

*Register* requesting public comments on the Annual Materials Plan ("AMP") prepared by DNSC. *See* 69 Fed. Reg. 67,301 (Nov. 17, 2004).  The AMP included a proposed ceiling of 6,000 long tons ("LT")[3] for quebracho sales in 2005 and 2006.  *Id.*  DNSC plans to sell this amount to two companies, Lyons & Volpi Leather and Westan, at an average of $115 per ton.  (Pls.' Mot. for Prelim. Inj., Ex. 1 (Bengolea Aff.) ¶ 21.)  The Chamber did not immediately file any comments because it hoped to respond to DNSC's market analysis, which had not yet been released for public review.

In a November 24, 2004 letter, DNSC told the Chamber that it would not be allowed to review the DNSC analysis until it was completed and reiterated its request for company-specific data.  (AR at 62-63.)  The Chamber replied on February 22, 2005, refusing to provide the requested data on the grounds that such disclosures could have substantial anti-competitive effects within its small industry.  (*Id.* at 68-72.)  The Chamber also asserted its concern that DNSC had adopted the AMP quantity of 6,000 LT for 2005 and 2006 without completing the market analysis required by the Court, and threatened to return to court if necessary to prevent sales of this volume.  (*Id.*)

On March 7, 2005, DNSC sent the Chamber its determination letter and an 80-page final market analysis, which DNSC relied upon to support the AMP quantities of 6,000 LT for both 2005 and 2006.  (*Id.* at 74-161.)  The MIC concurred with DNSC's conclusion that its proposed quebracho sales will not have an undue impact on the international market.  (*See id.* at 65-67, 74.)  However, plaintiffs claim that the two pages of comments from the Department of

---

[3]Quantities of quebracho are expressed in long tons ("LT"), each of which is equal to 2,240 pounds.

4

Commerce and brief email from the Department of State do not constitute sufficient review.  (*See* Pls.' Mot. at 6.)  Plaintiffs also attack the impartiality and validity of DNSC's market analysis, asserting that "instead of responding to this Court's injunction with open and impartial analysis of quebracho market impacts, Defendants have chosen to repeat the procedures that the Court disapproved.  At every key point in the process, Defendants have biased the analysis in their favor and excluded meaningful input from the Chamber." (*Id.* at 8.)  They argue that the resulting analysis is "fundamentally flawed." (*Id.* at 19.)

On April 22, 2005, plaintiffs filed this action seeking to enjoin DNSC from further sales of quebracho on the international market.  Subsequently, in May 2005, DNSC informed the Court of a delivery of 91 LT of quebracho to Lyons & Volpi and agreed to give plaintiffs ten days notice prior to any future quebracho deliveries to allow plaintiffs time to seek an injunction. (Deister Supp. Decl. ¶ 2.)  On July 11, 2005, defendants filed a motion notifying the Court that DNSC planned to allow the shipment of 29 LT of quebracho to Dyestuff International not before July 22, 2005.  (Deister Second Supp. Decl. ¶ 2.)  On August 16, defendants informed the Court that an additional 188 LT would be delivered August 26, 2005, bringing the total to 308 LT. (Deister Third Supp. Decl. ¶ 3.)  Plaintiffs agreed not to pursue their request for injunctive relief because of the relatively insignificant amount of quebracho involved in these three deliveries. (*Id.* at 2.)

Plaintiffs' motion for summary judgment and defendants' cross-motion to dismiss, or in the alternative for summary judgment, are now before the Court.[4]  A thorough review of the

---

[4]As the Court has considered matters outside the pleadings, it will treat defendants' motion as one for summary judgment, not as a motion to dismiss.  *See* Fed. R. Civ. P. 12(b)(6). Defendants' claim for dismissal based on lack of standing was previously rejected in *Chamber I.*

record indicates that plaintiffs' attacks on the quality and integrity of DNSC's analysis fail to show that DNSC lacked a rational basis for its decision to resume its quebracho sales or that DNSC committed any procedural violation.  The Court therefore grants defendants' motion for summary judgment and denies plaintiffs' cross-motion.

## ANALYSIS

### I.      Standard of Review

Under the APA, plaintiffs bear the burden of proving that defendants' proposal to sell the stockpiled quebracho was "arbitrary and capricious, and an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The standard of review is narrow and "begins with the presumption that [the agency's] decision is valid."  *Associated Metals and Minerals Corp. v. Carmen*, 704 F.2d 629, 633 (D.C. Cir. 1983).  The Court may not substitute its judgment for that of the agency when a rational basis has been provided for that decision. *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Rather, plaintiffs must show that the agency's decision was not "based on a consideration of the relevant factors" or reflects a "clear error of judgment."  *Id*; *see also Sloan v. Dep't of Hous. and Urban Dev.*, 231 F.3d 10, 15 (D.C. Cir. 2000) (citing *Motor Vehicle Mfrs' Ass'n; v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  As this Court emphasized in *Chamber I*, "[t]he 'agency must cogently explain why it has exercised its discretion in a given manner, and that explanation must be sufficient to enable [the Court] to conclude that the agency's action was the product of reasoned decision-making.'"  332 F. Supp. 2d at 48-49 (quoting *A.L. Pharma, Inc. v. Shalala*, 62

F.3d 1484, 1491 (D.C. Cir. 1995)).  If it can do so, its decision will stand.[5]

## II.    Plaintiff's Substantive Claims

Plaintiffs are concerned that DNSC's proposed sales will both reduce the price for quebracho and displace sales to tanners that the Chamber would otherwise make.  They allege that the loss in revenue resulting from these reductions in both the price and quantity of their sales, along with increased costs resulting from lower "capacity utilization,"[6] will result in a drastic loss of profits and possible plant closures, *i.e.*, "undue market disruption."  By defendants' analysis, on the other hand, prices in the quebracho market are extremely stable and, in fact, controlled in large part by plaintiffs.  Thus, defendants conclude that the DNSC sales will have little effect, if any, on the prices negotiated by the Chamber.  And even if the DNSC sales were to displace a full 6,000 LT of the Chamber's sales (which DNSC does not expect), the Chamber would suffer only a short-term loss of net revenue.[7]  According to DNSC, the impact

_____

[5]Plaintiffs argue that the agency's decision should be subject to "more exacting scrutiny" or is entitled to "no deference," because DNSC has a "history of a bias towards a particular interest."  (Pls.' Mot. at 11-12.)  According to plaintiff, it was a "pre-ordained" conclusion that a sale of 6,000 LT would not unduly disrupt the quebracho market.  (*Id.* at 12.)  However, even if plaintiffs' assertion of varying standards of review under APA were correct, the record does not reveal any evidence that DNSC was committed to a certain conclusion prior to undertaking a market analysis.  The fact that MIC announced the 6,000 LT figure four months prior to DNSC's issuance of a market analysis (*see id.*) means only that the agency sought to ensure that it *could* sell this amount *if* it could ensure complaince with the Stock Piling Act.  (Def.'s Opp'n to Mot. for Prelim. Inj., Deister Decl. ¶ 15.)  The 6,000 LT figure is an upper limit on sales that cannot be exceeded during the fiscal year, not a sales goal.  (*Id.* ¶ 12.)

[6]Plaintiffs have invested significant "fixed costs" in developing the capacity to produce quebracho extract.  The smaller quantity a plant produces, compared to what it could produce, the lower its "capacity utilization," and the higher the fixed cost per ton produced.

[7]Specifically, in the scenario of a declining market for quebracho, DNSC predicts that the Chamber's loss will be approximately $6.7 million in net revenues over the three years in which DNSC expects to be present in the market.  (AR at 145.)

on the Chamber's revenues from this displacement would fall short of "undue disruption of the market" within the meaning of the Stock Piling Act.  Indeed, DNSC expects that the market would in several years return to the state in which it would have been without DNSC sales.

Plaintiffs attack DNSC's resulting decision to resume sales of quebracho on two grounds: (1) DNSC has misinterpreted the Stock Piling Act's "undue disruption" standard; and (2) DNSC's market analysis is fundamentally flawed.  As discussed below, both arguments fail. The agency has acted in accordance with the statute and articulated a rational basis for its action.

### A.      DNSC's Interpretation of "Undue Market Disruption"

Plaintiffs allege that DNSC has misinterpreted the Stock Piling Act's mandate to avoid undue market disruption.[8]   They maintain that the Act requires DNSC to "avoid undue market disruption 'to the maximum extent that is capable of being done.'"  (Pls.' Mot. at 12 (quoting *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 508-09 (1981).)  However, as this Court suggested in *Chamber I*, plaintiffs persist in misinterpreting the statute's mandate, for *"some* market disruption is to be expected any time the government enters a market to dispose of surplus stockpiled materials . . . [The statute] does not demand that the government protect other quebracho market participants from all competition . . . ."  332 F. Supp. 2d at 49 n.9 & 54

---

[8]The pertinent section of the Act, 50 U.S.C. § 98e(b), reads:

To the maximum extent feasible --

(1) competitive procedures shall be used in the acquisition and disposal of such materials; and

(2) efforts shall be made in the acquisition and disposal of such materials to avoid undue disruption of the usual markets of producers, processors, and consumers of such materials and to protect the United States against avoidable loss.

(emphasis added).[2/]  Thus, the Stock Piling Act does not require an agency to completely avoid

market disruption; rather, it only demands that the agency protect producers and consumers from

"indiscriminate dumping" of stockpiled materials "in such quantities as might break the market."

*Associated Metals*, 704 F.2d at 635.  "[N]othing in the legislative history of the Stock Piling Act

indicates that Congress was concerned with anything but significant disruptions in commodity

markets caused by dumping surplus materials." *Id.*  Nor does the Act mandate that an agency

clearly define a test for what constitutes "undue market disruption;" the agency need only make a

"judgment call" about whether undue disruption has been avoided to the "maximum extent

feasible." *See Howes Leather Co. v. Golden*, 681 F. Supp. 6, 14 (D.D.C. 1987).

Plaintiffs identify two aspects of defendants' analysis which they claim are at odds with

the statute.  First, they argue that defendants have wrongly "deemed [market disruption] to be

'undue' only if Plaintiffs would not be able to continue profitable operations and would be forced

to close production facilities."  (Pls.' Reply at 3.)  Second, they allege that defendants

impermissibly assert that if the agency can increase competitiveness in a monopolistic market,

this justifies significant disruption.  (*Id.* at 5-6.)  In both cases, plaintiffs have misstated

---

[2/]For instance, plaintiffs incorrectly argue that DNSC must take "all possible steps to avoid undue market disruption" (Pls.' Mot. at 13),  "minimize market impacts to avoid so far as possible any *threat* of disruption and . . . refrain from interference in the usual markets to the maximum extent feasible." (Pls.' Reply at 6-7 (emphasis in original).)  These arguments misstate the law and ignore *Chamber I*'s analysis of the meaning of "undue disruption," *see* 332 F. Supp. 2d at 49 n.9, and its recognition that the Stock Piling Act requires a balancing of factors, and not just, as plaintiffs advocate, a consideration of the extent of disruption to the producers.  (*Id.* at 50.)  For instance, defendants have properly considered whether they are "to the maximum extent feasible . . . protect[ing] the United States against avoidable loss."  50 U.S.C. § 98e(b).  *See Chamber I*, 332 F. Supp. 2d at 50 ("[T]he evidence presented shows that the government examined the profitability of its sales as compared to the costs associated with storage or disposal.")

defendants' analysis, focusing on the summary "Conclusions" section at the end of the market analysis, rather than the analysis as a whole, and distorting the gist of defendants' analysis.

Plaintiffs point to DNSC's determination, based on a review of several dictionaries, that "undue" means "unjust, inappropriate, or unreasonable" (AR at 151), and its conclusion that while "[p]reventing suppliers from earning a profit or forcing dramatic job losses might be construed as unjust[,] [t]he projections show that DNSC sales will not have these impacts on the industry. The industry should continue to operate profitably. No plants will be forced to close by DNSC sales." (*Id.*) It does not follow from this brief summary paragraph, or any other part of the record, that defendants are using a "closure" test to define undue disruption. (*See, e.g.*, Pls.' Mot at 14-15, 17; Pls.' Reply at 3.) Rather, DNSC simply notes that its sales will not result in these drastic effects, and relies on this result as one factor in support of the conclusion that there will be no undue market disruption. As discussed in detail below, defendants' conclusion that the DNSC sales are consistent with the statute is supported by several other factors as well.

Similarly, while the agency determined that DNSC sales might create conditions that would be an "appropriate . . . offset[] [to] the monopolistic power that currently exists," and that the effect on the market would be "reasonable" in part because the sales would "benefit consumers" (AR at 151), these are only briefly mentioned considerations, and when the record as a whole is considered, they hardly stand out as central to the DNSC's decision. DNSC's analysis does depend significantly on the observation that the quebracho producers enjoy a monopoly, but this is primarily because monopolies react differently to changes in supply and demand as compared to competitive markets, not because DNSC feels justified in disrupting monopolistic markets. Moreover, while benefits to consumers would not necessarily justify

10

disruption of the market with respect to producers, and stockpiles "are not to be used as a means of controlling or influencing commodity prices," *Associated Metals*, 704 F.2d at 632-33 n.5, it was proper, if not required, for DNSC to consider the effect of its sales on consumers. *See* 50 U.S.C. § 98e(b) (requiring agency "to avoid undue disruption of the usual markets of producers, processors, *and consumers* of such materials . . . .") (emphasis added). *See also supra* note 9.

In another criticism of DNSC's interpretation of the statute, plaintiffs analogize the Stock Piling Act's "undue disruption" standard to the International Trade Commission ("ITC") requirement that imports not cause "material injury" to U.S. industry.  19 U.S.C. § 1673d(b). Plaintiffs argue that because the ITC has found material injury when market share would be decreased by as little as 5 to 10%, or when profits would drop by 6.5 to 18%, the potential reduction in the Chamber's international market share of up to 15% and the alleged 57% decline in profits should be considered "undue."  (Pls.' Mot. at 16-17.)  However, even aside from the point that the latter figure and accompanying analysis was not before the agency when it made its decision, plaintiffs' analogy cannot survive.  Equating "undue disruption" with "material injury" would be inconsistent with the legislative history of the Stock Piling Act and applicable case law. *See Associated Metals*, 704 F.2d at 634-36 (discussing legislative history) & 630 (acknowledging that "there will be some market disruption and [the plaintiff] will make smaller profits . . . than it would if [the government] were not a seller in [this] market," but agreeing this injury did not amount to "undue disruption" of the market).[10]  Even without the benefit of these authorities, it is

---

[10]Defendants argue that the ITC comparison is inapt because DNSC did not have sufficiently detailed information to make the type of determination made by the ITC.  While this may be true, the lack of data is irrelevant to the question presented: whether the *magnitude* of "material injury" should be used as a benchmark for identifying "undue disruption."

self-evident that "material" implies a much lower level of harm than "undue."

Because DNSC was not required to specifically define "undue market disruption," but only to make a case-specific determination based on reasonable balancing of the relevant factors, *Chamber I*, 332 F. Supp. at 49 n.9 (quoting *Howes Leather Co.*, 681 F. Supp. at 14), plaintiffs' additional challenges to DNSC's conclusions are more properly dealt with as part of the Court's APA review, not as a matter of statutory interpretation. Thus, the Court will proceed to consider whether the agency has demonstrated a rational basis for its conclusion, which, as previously noted, does not mean that the Court should decide whether undue market disruption is in fact likely to occur. *Id.*

### B.     DNSC's Market Analysis

Plaintiffs complain that DNSC's market analysis is "fundamentally flawed" and submit a detailed critique prepared by ECA in 2005. (*See* Pls.' Mot. for a Prelim. Injunction, Ex. 2. ["Maxim 2005"].) As the Court must limit its review to the record before the agency at the time of its decision, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985), it will consider the ECA document only to the extent that it sheds light on potential flaws in the agency's reasoning, but not as independent evidence of the potential impact of DNSC sales. Similarly, DNSC's response to this document (*see* Defs.' Reply, Ex. 1) may not provide a *post-hoc* rationalization for the agency's decision. The Court must be able to discern the agency's decisionmaking path from the market analysis itself. *See, e.g.*, *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health and Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005) ("[A]n agency's discretionary order will be upheld, if at all, on the same basis articulated in the order by the agency itself.") (internal quotation omitted).

A close examination of the record shows that DNSC's market analysis meets, and indeed exceeds, the requirements of the APA.  As this Court pointed out in *Chamber I*, defendants need only provide an explanation "sufficient to enable [the Court] to conclude that the agency's action was the product of reasoned decisionmaking,"  332 F. Supp. 2d at 48-49 (citing *A.L. Pharma*, 62 F.3d at 1491).  "[The Court] must look at the decision not as the chemist, biologist or statistician that [the Court is] qualified neither by training nor expertise to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality."  *Ethyl Corp. v. EPA*, 541 F.2d 1, 37 (D.C. Cir. 1976).  The Court now turns to the agency's decision.[11]

DNSC's market analysis points to a number of factors leading it to conclude that its proposed sales will not significantly disrupt the market.  First, and central to its reasoning, is the observation that supply and demand are not the driving forces in determining prices in the quebracho market.  For instance, prices have historically been insensitive to changes in demand (AR at 92, 137) and "remarkably stable for a commodity."  (*Id*. at 115.)  Furthermore "dramatic changes" in DNSC sales quantities in the past "did not have any impact on the value of imports."[12]  (*Id*. at 117.)  As such, DNSC does not expect that the increase in supply caused by

---

[11]As an initial matter, the Court notes that defendants have conceded several of the points that plaintiffs persist in challenging.  Defendants acknowledge that their sales will observably impact plaintiffs' profits. (AR at 151.)  They acknowledge that the statute requires them to avoid disruption in monopolistic, as well as competitive, markets.  And, despite the quibbling between the parties as to whether defendants' sales will displace a corresponding quantity of plaintiffs' sales, DNSC's projection of impacts takes the conservative approach and assumes the worst. (AR at 142.)  Thus, plaintiffs' arguments as to these conceded issues need not be addressed.

[12]Prices are "indicated by import value."  (AR at 117.)

its proposed release of stockpiled materials will depress the prices obtained by plaintiffs.  Also

contributing to DNSC's conclusion that prices will remain stable is its observation that the

quebracho market is much closer to a monopoly than to a perfectly competitive market.  There

are only two companies producing quebracho (*i.e.*, in economic terms, there is "high

concentration"), the barriers to entry are high (for example, the quebracho tree grows only in

South America), and there is evidence that the companies have been able to extract higher prices

than a truly competitive market would allow.  (*Id*. at 100, 104-05, 108-09, 111-113.)

As for the impact of DNSC sales on the quantity of quebracho sold by the Chamber,

DNSC observed that its sales were unlikely to displace a full 6,000 LT of Argentine quebracho

because DNSC may not be able to find buyers for the full amount (*id.* at 150), its quebracho is 40

years old and of significantly inferior quality to the Chamber's quebracho (*id.* at 126; Weiskel

Decl. ¶ 4),[13] tanners who normally use other materials (and thus would not be customers of the

Chamber) might buy the discounted quebracho, and DNSC sales have not historically displaced

those of the Chamber.  (*Id.* at 119 (noting a *positive* correlation between DNSC and Argentine

sales).)  Thus, the impact of DNSC's sales "will be tempered."  (*Id.* at 78.)

Assuming nevertheless that the Chamber's sales would decline by the exact amount of the

quebracho stockpile defendants intend to release over the next several years, DNSC proceeded to

analyze projected impacts of such a displacement in each of three market scenarios.[14]  In the

---

[13] *See Chamber I*, 332 F. Supp. at 51 n.10 (discussing why the government's quebracho is
"less valuable" than that sold by the Chamber).

[14] DNSC also prepared a baseline scenario that considered, hypothetically, what the
impact would have been if the agency had *not* buried 60,000 LT of quebracho since 2001 and the
market had continued to decline.  (AR at 142-44 ("This scenario projects the largest impact that
DNSC's intent to sell coupled with the quantity in inventory *might have had* on the industry.")

worst case scenario (*i.e.*, a declining market for quebracho), the DNSC sales result in a loss of approximately $6.7 million (net present value) over the three years during which DNSC has enough inventory to stay in the market.  (*Id*. at 145.)  However, by 2008, the Chamber's revenues and costs return to the level at which they would have been had DNSC never released its stockpile.  (*Id*.)  The Formosa plant closes in 2018 as a result of market conditions and not because of the DNSC sales.  In the second and third scenarios (of variable and growing demand, respectively), DNSC remains in the market for longer, but its impacts on profits are less.  (*Id*. at 147-9.)  DNSC thus noted that the impact of delaying sales of its quebracho stockpile would be "minimal."  (*Id*. at 149.)  Given these projections, along with its other observations about the quebracho market, DNSC concluded that the industry would continue to operate profitably, no plants would close, consumers would benefit from greater competition in the market, and, based on historical evidence, the effects of DNSC sales would likely be "significantly smaller than the changes faced by the industry because of normal changes in business conditions."  (*Id.* at 152.) As such, defendants' analysis concludes that there is "nothing to indicate continuation of DNSC's quebracho sales will cause undue disruption of the usual markets of the producers, processors and consumers of quebracho tannin."  (*Id*.)  Having thus determined that they would avoid "undue disruption" entirely, defendants did not go on to consider whether they had done so "to the maximum extent feasible."  50 U.S.C. § 98e(b).

---

(emphasis added).)  This analysis, which concluded that DNSC sales could have resulted in the closure of the Formosa plant in 2012, was for comparison purposes only and does not represent a prediction of future impacts.  Thus, despite plaintiffs' references to the contrary, DNSC at no time predicted that its sales would result in closure of the Formosa plant.  Rather, DNSC found that in a declining market, the Formosa plant is likely to close in 2018, with or without DNSC sales.  (AR at 145.)

Although plaintiffs find fault with several aspects of this analysis, they do not succeed in their assault on DNSC's conclusions.  For example, plaintiffs contend that the agency has erred in drawing on evidence of the impacts (or lack thereof) of historic sales when,  in fact, "the story is quite different" today.[15/]  (Pl.'s Mot. at 23.)  Whereas past DNSC sales were mainly for consumption within the United States, plaintiffs point to the fact that if the proposed sales occur, "four times the historic volume would be released to two companies . . .  that will, for the first time, target the industry's international markets" in competition with the Chamber.  (*Id.*)  However, DNSC relied upon its analysis of historic stockpile sales primarily as one pertinent example of stability in the market.  It had ample additional evidence of the general insensitivity of quebracho prices to shifts in demand and supply: not only has there been little historic correlation between changes in demand on the international market and changes in quebracho prices (AR at 92, 137), but the market exhibits a number of monopolistic characteristics which suggest that plaintiffs may have significant control over prices.  (*Id.* at 100, 104-05, 108-09, 111-113.)  Moreover, plaintiffs' assertion that the two-producer quebracho market is in fact competitive-- forcing the Chamber's members to be "price-takers" instead of "price-makers"-- because "there are viable substitutes (both natural and synthetic) for [quebracho]" (Pls.' Mot. at

---

[15/]Plaintiffs also criticize the agency for failing to consider the fact that stockpile sales between 1990 and 2000 "led to the closure of three factories and the collapse of the companies that operated them."  *Chamber I*, 332 F. Supp. 2d at 47 n.5.  (Pls.' Mot. at 23.)  However, plaintiffs misstate the Court's findings in *Chamber I*.  The language cited by plaintiffs did not recognize a causal link between DNSC sales and plant closures, but rather merely quoted plaintiffs' complaint.  Moreover, defendants' analysis casts doubt on the validity of drawing such a causal connection.  (*See* AR at 117-121.)

20-21), was thoroughly addressed in DNSC's market analysis (*see* AR at 127-131, 137),[16] and the Court has no basis for concluding that DNSC's assessment of the market as monopolistic is fundamentally flawed or unsupported by the record.[17]

Plaintiffs also claim that, even if prices remain absolutely stable, DNSC has vastly underestimated the impact on plaintiffs' profits and wrongly judged it to be "not significant." According to ECA's analysis, a 6,000 LT sale would "at a minimum . . . result in a 57% reduction of annual profit, assuming the average world price of [quebracho] was not affected." (Pls.' Mot. at 20.)  Again, plaintiffs fail to demonstrate "clear error" in the agency's analysis. Instead of identifying factors not considered by the agency or an error of judgment, plaintiffs present an alternative projection of impacts based on their own data regarding plant capacities, breakeven capacities, market size and variable costs.  In light of the deference that must be afforded to the agency's analysis, plaintiffs' presentation of a possible alternative analysis does

---

[16]Plaintiffs also assert that the Chamber's decision to keep the Formosa plant open, despite the fact that it would be better for Chamber producers as a whole if the plant were closed, is evidence that the Chamber is not a monopoly because it shows that the industry prioritizes social responsibility over higher profits. (*See* Pls.' Mot. at 22.)  However, acting in a socially responsible manner with a concern for protecting jobs and avoiding plant closures has nothing to do with whether Chamber members have monopolistic power that leads to stability in prices. Rather, the monopolistic nature of the quebracho market is evidenced by the economic analysis of its structure, which indicates, according to the U.S. Department of Justice's Herfindahl-Hirschman Index used to measure market concentration, "this industry is 'concentrated' and represents a market where monopolistic practices can easily occur."  (AR 105-06.)

[17]Moreover, as explained in the market analysis, the effect of the possibility of substitution perceived by plaintiffs would be a double-edged sword.  (AR 128.) While tanners can theoretically choose to buy other, cheaper materials instead of the relatively expensive quebracho sold by the Chamber-- depressing the prices that can be realized by plaintiffs--some of the highly discounted quebracho sold by DNSC might also go to tanners using more expensive material *instead of* displacing plaintiffs' sales.  Thus, DNSC's reasoning is sound even if some substitution with other vegetable tannins is possible and creates a more competitive market.

not suffice to defeat summary judgment, especially when this analysis was prepared *after* the agency rendered its decision.  Moreover, even if plaintiffs' estimates are correct, they do not necessarily show that DNSC sales "might break the market."  *Associated Metals*, 704 F.2d at 635.  The ECA analysis focuses on a single year of lost profits, whereas the agency's analysis of the next fifteen years shows that the companies will suffer only short-term effects.  Nor do any of the other issues identified by plaintiffs suffice to defeat the agency's analysis or cast doubt on its "judgment call" as to whether its projected impacts constitute "undue market disruption."[18]

### III.    Plaintiffs' Procedural Claims

Plaintiffs claim that DNCS "prevented the Chamber from any meaningful opportunity for input" into the agency's decisionmaking process, thereby violating the APA, or alternatively, offending procedural due process.  (Pls.' Mot. at 24.)  Plaintiffs point to *Chamber I*, in which this Court found that DNSC failed to "conduct any analysis based on the information it received [from the Chamber]."  332 F. Supp. 2d at 53.  But the Court's holding in *Chamber I* was based on the agency's total lack of analysis (including, by definition, a lack of analysis of the Chamber's input), not on its failure to consult more extensively with quebracho producers.  *Id*. at 54.  Thus, plaintiffs have seriously misinterpreted the Court's reasoning.  *Chamber I* did not require DNSC to allow for a particular level of participation by any member of the quebracho

---

[18]/For example, plaintiffs claim that the agency's analysis is flawed because it did not consider the data provided by the Chamber.  This assertion is simply wrong.  (*See*, *e.g.*, AR at 142 (considering breakeven capacity and variable cost data provided by plaintiffs).)  *See also infra* note 19.

market in its subsequent analysis, but only to consider the relevant information. *Id*.[19]   Here,

DNSC has responded extensively to the two reports submitted to the agency by the Chamber (*see*

AR at 122-141), thereby undermining any factual argument that DNSC has ignored the

Chamber's concerns.[20]   Moreover, as discussed herein, plaintiffs' claims of procedural error

under the APA and due process clause are equally unpersuasive.

### A.    APA Notice and Comment

Plaintiffs argue that the agency's failure to provide "interested persons" with notice and

an opportunity to comment on the determination to resume quebracho sales violated the APA.   It

is well settled, however, that one-time decisions on specific transactions (as opposed to

substantive rules) are exempt from APA notice and comment.   *See* 5 U.S.C. § 553(b)(3)

("Except when notice or hearing is required by statute, this subsection does not apply to

interpretive rules, general statements of policy, or rules of agency organization, procedure, or

practice."); *see United States v. Mead Corp.*, 533 U.S. 218, 223 (2001) ("Since ruling letters

respond to transactions of the moment, they are not subject to notice and comment before being

issued."); *Daingerfield Island Protective Soc'y v. Babbit*, 823 F. Supp. 950, 957 (D.D.C. 1993)

("[the National Park Service's approval of the design of an interchange is] an isolated agency act,

---

[19]It is worth noting that DNSC nevertheless invited and, in fact encouraged, the Chamber
to provide its data for use in the analysis.  (*See* AR at 1-4, 62-63).  The Chamber shared statistics
regarding developments in the quebracho industry as well as the ECA reviews.  (*See* AR at 5-6,
162-65).  As noted earlier, the record also shows that DNSC used this information in its own
analysis and thoroughly considered the two ECA reviews submitted prior to the market analysis.
(*See, e.g.*, AR at 100, 102-3, 106, 122-41.)

[20]Though plaintiffs claim that "[d]efendants effectively precluded any rebuttal [of the
market analysis] from ECA," plaintiffs point to no authority requiring that defendants provide an
opportunity for "rebuttal."  (Pls.' Reply at 11.)

which in no way proposed to effect or govern subsequent agency acts or decisions.  [It] has no future effect on any other party before the agency.  This sort of isolated act is not what the Congress intended to subject to the APA's formal notice and comment process").  DNSC's determination to sell 6,000 LT of quebracho in 2005 and in 2006 falls squarely within this category of "isolated acts"; it is not a substantive rule, but a one-time decision by DNSC and is therefore exempt from notice and comment procedures.  The possibility that the current determination may govern future sales decisions is irrelevant.

The cases cited by plaintiffs to support their claim that DNSC's determination constitutes a substantive rule under the APA are easily distinguishable.  In each case, the rule at issue added requirements or made material changes that altered the existing law or policy, triggering a requirement to provide notice and comment.  *See, e.g.*, *Nebraska Dep't of Health & Human Services v. Dep't of Health & Human Services*, 340 F. Supp. 2d 1, 20-22 (D.D.C. 2004); *Duggan v. Bowen*, 691 F. Supp. 1487, 1514 (D.D.C. 1987); *Nat'l Treasury Employees Union v. Newman*, 768 F. Supp. 8, 12-13 (D.D.C. 1991).  DNSC's one-time decision to exercise its authority under the Stock Piling Act by selling 6,000 LT of quebracho does not represent a change in law or policy.

Other courts have agreed that notice and comment regarding the disposition of stockpiled materials under the Stock Piling Act is not required.  *See Howes Leather Co*., 681 F. Supp. at 14; *Associated Metals*, 704 F.2d at 636.   Moreover, allowing for notice and comment regarding each potential sale of stockpiled material would be a near logistical impossibility as the agency is responsible for determining the appropriate quantity of approximately fifty different materials for release each year.

**B.      Procedural Due Process**

Plaintiffs' procedural due process claim also fails because plaintiffs cannot show that the government has deprived them of a protected interest in "property" or "liberty." *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Plaintiffs argue that they have a property interest at stake because they purchased quebracho from the DNSC stockpile in the past, but to have a protected property interest, "a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).  The relationship between plaintiffs' property interest in their quebracho and DNSC's decision to sell 6,000 LT of its own stockpiled quebracho is too far attenuated for plaintiffs to be able to prove that DNSC has deprived them of property.  Thus, plaintiffs cannot make out a due process claim.

## CONCLUSION

For the reasons stated above, defendants' cross-motion for summary judgment is granted and plaintiffs' motion is denied.  While the Chamber will almost certainly suffer a loss of profits as a result of the agency's decision, it is not the Court's role to protect them from such harm where the agency has put forth a reasonable basis for its actions.  In making its decision to resume sales of stockpiled quebracho, defendants have fulfilled their responsibility, as defined by this Court in *Chamber I*, to comply with the requirements of the Stock Piling Act.  A separate Order accompanies this Memorandum Opinion.

s/
_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   August 30, 2005